**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-1027**

---

FX AVIATION CAPITAL LLC,

     Plaintiff – Appellant,

  v.

HECTOR GUERRERO; MARK LIKER; ANATOLY GALUNOV; AIRLUX
AIRCRAFT INC., f/k/a Stratus Aircraft; LG AVIATION INC.,

     Defendants – Appellees,

and

VARGHESE SAMUEL,

     Defendant.

---

Appeal from the United States District Court for the District of South Carolina, at
Greenville. Henry M. Herlong, Jr., Senior District Judge. (6:22-cv-01254-HMH)

---

Submitted: November 26, 2024       Decided: February 18, 2025

---

Before WILKINSON, GREGORY, and RICHARDSON, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Wilkinson
and Judge Richardson joined.

---

**ON BRIEF:** William H. Foster, LITTLER MENDELSON, P.C., Greenville, South
Carolina, for Appellant. Craig R. Smith, SMITH LAW FIRM, Woodland Hills, California,
for Appellees**.**

---

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

This appeal stems from a long-standing dispute between Plaintiff-Appellant FX Aviation Capital, LLC ("FX") and several former business partners——LG Aviation, Inc., Mark Liker, Hector Guerrero, Anatoly Galunov, and Stratus Aircraft n/k/a Airlux Aircraft, Inc. (collectively "Defendants").  FX alleges that, based on Defendants' misrepresentation of their assets, it loaned significant sums of money to Defendants for the purpose of acquiring and refitting airplanes.  After Defendants defaulted on the loans, FX gained control of the planes.  But, in an effort to force FX to forgive the loans, Defendants refused to hand over the planes' logbooks, significantly decreasing their value.

FX brought a civil Racketeer Influenced and Corrupt Organization Act ("RICO") suit against the Defendants alleging that they had:  (1) conducted or participated in an enterprise's pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); and (2) engaged in a conspiracy to do so, in violation of 18 U.S.C. § 1962(d).  The district court granted summary judgment for Defendants on both counts.  For the reasons set forth below, we affirm.

## I.

### A.

In February 2016, Liker and Guerrero formed LG Aviation, Inc., with the two serving as co-owners and Liker as CEO.[1]  J.A. 214, 385.  Prior to the formation of LG,

---

[1] Because we affirm the grant of summary judgment in Defendants' favor, we recount the facts in the light most favorable to FX.  *See Goodman v. Diggs*, 986 F.3d 493, 497–98 (4th Cir. 2021).

Guerrero also owned Stratus (later renamed Airlux Aircraft). *Id.* At some later point, Liker hired Gulanov to manage Stratus. J.A. 215.

From March 2016 through December 2017, FX and LG entered into various loan agreements relating to four aircrafts: a Boeing 737-400, an Embraer, and two Learjets. J.A. 215, 224. Under the agreements, FX loaned money to LG to allow LG to purchase and refurbish the planes. J.A. 7. FX alleges that, on multiple occasions, Liker and LG repeatedly misrepresented their assets and, rather than use the loans for the purchase and refurbishment of the aircrafts, the Defendants used the loan proceeds for their personal benefit and use. *Id.*; Opening Br. at 13. For example, Liker provided financial documents to FX stating that his net worth exceeded $20 million. J.A. 14. FX alleges that, at the time he made these representations, Liker knew that his net worth was less than $20 million. J.A. 9.

As 2017 continued, LG began missing loan payments. *See* J.A. 459. But the parties continued to enter into loan agreements. J.A. 10–12. In support of these additional loans, in mid-August 2017, Liker emailed FX additional documents and pledged a trust account he controlled to secure the loans. J.A. 10. In October 2017, another company, Regional One, expressed interest in purchasing the Embraer aircraft. J.A. 11–12. Due to the poor condition of the plane, the sale fell through. *Id.* FX alleges that Liker "absconded" with Regional One's deposit. J.A. 13. In December 2017, FX declared a default on all loans. J.A. 218, 386.

In the words of the district court, on March 22, 2018, "Guerrero—seemingly acting on LG's behalf—executed a bill of sale transferring the Boeing to FX." J.A. 386; *see also*

J.A. 318 (Boeing bill of sale). Liker insists that he was unaware that Guerrero made the sale until July 2018. J.A. 142, 342. In violation of federal law, LG failed to deliver the Boeing's logbooks along with it. J.A. 386–87; *see* 14 C.F.R. § 91.417(b)(1) (requiring maintenance records to be "transferred with the aircraft at the time the aircraft is sold.").

An aircraft without its logbooks has a significantly lower market value than it would with them. As the district court explained, "without the maintenance records, FX asserts that the [planes] were essentially unmarketable." J.A. 388; *see also* J.A. 310 (deposition of Kimbrell: "we were essentially told [by various aviation experts and lawyers] that the value of the plane was scrap without the records").

Still believing that LG owned the aircraft, Liker purported to hire a man named Varghese Samuel to conduct a comprehensive maintenance check of the Boeing plane, which required a review of the plane's logbooks. J.A. 388. FX alleges that Liker and Samuel worked in concert to conceal the logbooks and that Liker and Galunov demanded that FX forgive the loans before handing over the logbooks. Opening Br. at 9; *see* J.A. 433–34, 454. In essence, FX alleges that Liker and Gulanov held the Boeing's "flight and maintenance records for ransom." Opening Br. at 9. Citing the Bill of Sale, the legitimacy of which FX does not appear to question, Defendants state that FX sold the Boeing to CF Aviation Trust, LLC on June 25, 2018. J.A. 347.

On July 6, 2018, Liker and Joshua Kimbrell, FX's Chief Operating Officer, engaged in an exchange of emails regarding logbooks for the Embraer aircraft. Liker wrote:

> With regard to a potential buyer [for the Embraer], please provide me with his contact information and I will call him early in the morning. Given the

4

change in tone reflected in the default notice email, I would like to discuss his intentions and may send the logbooks if satisfactory.

J.A. 340.

On the same day, Guerrero signed over ownership of the Embraer from LG to FX.

J.A. 319.  And, on July 19, Guerrero signed over both Learjets to FX.  J.A. 320–21.

On July 30, 2018, Liker sent Kimbrell another email.  In that email, he expressed surprise that FX had purchased the four airplanes.  J.A. 342.  Liker stated:

There was no communication with you with regard to and I had no knowledge of these transactions.  The bills of sale were signed by Hector [Guerrero] who was not involved in our planning discussions, has not been making any payments on the aircraft loans and who abandoned the operations and left the country about 3 months ago to run for political office in Mexico. If you were honest, why ask Hector and not me to sign the bill of sale?

J.A. 342.

On August 20, 2018, Liker sent Kimbrell and his attorney the following email:

. . . While we have been discussing the possibility of bringing this matter to an amicable resolution, I received this letter from your attorney threatening me with contempt proceedings unless I produce the logbooks by this coming Tuesday.

As you know from [Samuel] and myself, I don't have the logbooks in my possession and don't have control of them.  We have both been in discussion with [Samuel] to obtain these . . . .

J.A. 345.

On September 4, 2018, FX claims that Samuel, "acting on behalf and/or direction of LIKER, sent an electronic text message to [FX], stating that GULANOV was demanding money from [FX] in exchange for the return of the Boeing 737 aircraft's flight and maintenance records."  J.A. 16.

FX also stated that Liker directed Samuel to falsely claim that he had done $500,000 worth of maintenance on the planes. Opening Br. at 13; J.A. 437–38. On December 26, 2018, FX sold the Embraer to Exodus Aircraft. J.A. 348.

In total, after having repossessed the four planes, FX sold the planes at considerable losses. Because FX did not have the logbooks, it was forced to sell the Boeing for $400,000—a loss of approximately $1,550,000. J.A. 15–16. FX suffered a loss of $530,000 and $365,000 on the two Learjets. J.A. 14–15.

B.

In April 2022, FX sued Galunov, Guerrero, LG, Liker, Samuel, and Stratus Aircraft, alleging civil RICO violations under 18 U.S.C. §§ 1962(c) and (d). J.A. 389.

FX sought, and received, an entry of default as to Guerrero. Request for Entry of Default Against Guerrero, *FX Aviation Capital LLC v. Guerrero et al.*, 6:22-cv-01254 (D.S.C.), ECF No. 16;[2] Entry of Default as to Galunov, Guerrero, Stratus Aircraft n/k/a Airlux, ECF No. 19. FX then filed an Amended Complaint, naming Galunov, Guerrero, LG Aviation, Liker, and Stratus. Amended Complaint, ECF No. 30. The district court reissued summons to Guerrero. Summons Reissued as to Guerrero, ECF No. 32.

In October 2022, Galunov, LG Aviation, Liker, and Stratus moved to dismiss or, alternatively, for summary judgment, arguing that FX's claims were time-barred. J.A. 389. Applying the "separate accrual rule," the district court denied the motion, explaining that "FX claims are not time-barred in their entirety." J.A. 389; *see also* J.A. 87–98. The

---

[2] All ECF citations are to the district court record. *See FX Aviation Capital LLC v. Guerrero et al.*, 6:22-cv-01254 (D.S.C.).

6

district court held that because FX was "on notice that it had suffered concrete financial losses stemming from Defendants' default before April 19, 2018 [the furthest back the statute of limitations stretched]," "FX cannot recover under RICO any damages, including any unpaid loan balances, caused by Defendants' pre-April 19, 2018 predicate acts." J.A. 94. However, it also held that "[t]he existence of time-barred predicate acts does not prevent FX from recovering for new injuries caused by non-time barred predicate acts occurring within the limitations period." J.A. 96. Because FX alleged potential acts of wire fraud that were not time-barred (Liker's July 3, July 30, and August 20, 2018 emails and Samuel's September 4, 2018 text message), the district court denied Defendants' motion to dismiss. J.A. 96–98. Neither party is appealing that order.

In October 2023, Galunov, LG, Liker, and Stratus filed a motion for summary judgment as to all claims. J.A. 180. After the summary judgment motion was fully briefed, the district court ordered FX "to provide the court [by December 5, 2023] with proof of proper service in this case as to defendant Hector Guerrero or the case against this defendant will be dismissed for lack of prosecution." Text Order, ECF No. 144. On December 5, in accordance with the court's order, FX filed a waiver of service as to Guerrero. Waiver of Service, ECF No. 148.

The following day, the court granted Galunov, LG, Liker, and Stratus's motion for summary judgment. J.A. 385. In the grant of summary judgment, the district court held that summary judgment was appropriate because FX failed to demonstrate that the scheme constituted a "pattern of racketeering activities"—one of the elements of a RICO cause of action. J.A. 391.

The district court then directed the clerk to enter judgment in the case, stating "[t]he issue of whether Defendant Hector Guerrero has been properly served or whether an answer is required in this case is moot in light of the court's December 6, 2023 order granting summary judgment in this case." Text Order, ECF No. 153. Per the court's direction, the clerk granted summary judgment as to Liker, Galunov, Stratus, and LG Aviation. Judgment, ECF No. 154.

FX Aviation then filed a notice of appeal. J.A. 397. Also pending before us are Appellees' Request for Judicial Notice (Dkt. 34) and Appellant's Consent Motion to Supplement Record on Appeal (Dkt. 58).

## II.

Before we consider the merits of an appeal, we have an independent "obligation to verify the existence of appellate jurisdiction." *Palmer v. City Nat'l Bank, of W. Va.*, 498 F.3d 236, 240 (4th Cir. 2007). This Court has "jurisdiction of appeals from all *final decisions* of the district courts of the United States." 28 U.S.C. § 1291 (emphasis added). We hold that the district court's grant of summary judgment constitutes a final decision and, therefore, this Court may exercise jurisdiction.

"In the ordinary course a 'final decision' is one that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Calderon v. GEICO Gen. Ins. Co.*, 754 F.3d 201, 204 (4th Cir. 2014) (cleaned up). "In making . . . [the finality] assessment, we look to substance, not form." *Porter v. Zook*, 803 F.3d 694, 696 (4th Cir. 2015). So, "[r]egardless of the label given a district court decision, if it appears from the

record that the district court has not adjudicated all of the issues in a case, then there is no final order." *Id.*

"Ordinarily, a district court order is not 'final' until it has resolved all claims as to all parties." *Fox v. Balt. City Police Dep't*, 201 F.3d 526, 530 (4th Cir. 2000); *see also Britt v. DeJoy*, 45 F.4th 790, 793 (4th Cir. 2022). For example, this Court determined that a district court's dismissal of the plaintiff's complaint was not a "final decision" when the district court failed to rule on one of the plaintiff's claims. *Porter*, 803 F.3d at 696–97. For this reason, only complete (and not partial) grants of summary judgment constitute final orders. *Calderon*, 754 F.3d at 203.

In *Hixson v. Moran*, this Court distinguished *Porter* and found that it did possess jurisdiction. *See generally* 1 F.4th 297 (4th Cir. 2021). There, the plaintiff, a prisoner, brought two claims for deliberate indifference, one based on the denial of insulin and one on the denial of other medication. *Id.* at 301. On appeal, the plaintiff argued that the district court only ruled on his noninsulin claim and, therefore, there was no final order. *Id.* The Court disagreed, explaining that the district court "addressed the 'central component' of [the plaintiff's] deliberate indifference claims." *Id.* (quoting *Porter*, 803 F.3d at 699). The Court noted that the district court "order display[ed] an awareness of the second claim" and used "language encompassing [the doctor's] consideration of medication in addition to insulin." *Id.*

We find that this case presents a situation closer to *Hixson* then *Porter*. At first blush, that does not seem so: Here, the district court's judgment, by its terms, only applies

to Liker, Galunov, Stratus, and LG.  Judgment, ECF No. 154.  And the motion which the district court granted was only for those four defendants—and not Guerrero.  J.A. 180.

But, while the district court's order failed to mention Guerrero, the record as a whole demonstrates the district court's awareness of the claims against Guerrero and its intention to dismiss the case in its entirety, including as to Guerrero.  The district court's opinion granting summary judgment states that FX's two RICO claims failed as a matter of law because FX could not establish that Defendants had engaged in a "pattern of racketeering activity."  J.A. 391.  This element of the RICO analysis hinges on the nature and duration of the scheme as a whole, not the individual actions of each member.  Therefore, as the parties agree, the inclusion of Guerrero would not alter the analysis of whether the scheme satisfied this requirement.  FX Supplemental Br. at 3–5 (Dkt. 60); Defendants Supplemental Br. at 2–3 (Dkt. 61).  The district court's summary judgment order thus addressed the "central component" of the claims against Guerrero, indicating that it is a final decision.  *Hixson*, 1 F.4th at 301.

Furthermore, after granting summary judgment, the district court held that any further proceedings pursuant to Guerrero were moot, indicating the district court's belief that its summary judgment order had dealt with the case in its entirety.  Text Order, ECF No. 153.  The district court then directed the clerk to enter judgment "in this case," not only as to the parties listed in the motion for summary judgment or in the summary judgment order.  Text Order, ECF No. 153.  As in *Hixson*, this shows the district court's "awareness" of FX's claims against Guerrero and its belief that it had resolved all claims as against all parties, including through a mootness ruling.  1 F.4th at 301.

10

While the district court should have been clearer, taken together with the summary judgment opinion and the district court's subsequent orders, the grant of summary judgment was a final order for purposes of § 1291. In light of the entire record, we hold that we possess jurisdiction.

## III.

Having satisfied ourselves that we have jurisdiction, we turn to the merits of the case. "We review the district court's grant of summary judgment de novo, 'using the same standard applied by the district court.'" *Goodman*, 986 F.3d at 497 (quoting *Brooks v. Johnson*, 924 F.3d 104, 111 (4th Cir. 2019)). "[A] court should grant summary judgment only if, taking the facts in the best light for the nonmoving party no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Id.* at 497–98.

## IV.

FX brought two claims against all Defendants: one count of a civil violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. § 1962(c), and one count of RICO conspiracy, *see* 18 U.S.C. § 1962(d). J.A. 19, 26.

Finding that FX failed to demonstrate that the Defendants had engaged in a "pattern of racketeering activities," one of the elements for a RICO cause of action, the district court granted summary judgment on Count I. J.A. 395. And, because it granted summary judgment on Count I, the district court concluded that the conspiracy count, Count II, "necessarily fails" and granted summary judgment on that as well. *Id.*

11

On appeal, FX objects to this holding, arguing that there is a genuine dispute of material fact that the Defendants engaged in a pattern of racketeering activity. In contrast, Defendants defend the district court's holding and, in addition, argue that: FX lacks constitutional standing; FX is not a proper party to bring a RICO claim; and FX failed to establish that Defendants committed a predicate offense.[3]

We first find that FX has constitutional standing. As for FX's RICO claim under 18 U.S.C. § 1962(c), we affirm the district court's finding that there is no genuine dispute as to whether Defendants engaged in a pattern of racketeering activity, such that FX's claim fails. We decline to consider whether FX is a proper party to bring suit and whether Defendants committed a predicate offense. Because Defendants did not conspire to engage in a pattern of racketeering activity, summary judgment must be granted as to FX's § 1962(d) claim. We therefore affirm the district court's grant of summary judgment on both counts.

## A.

We first consider whether FX has constitutional standing to bring its claims. "Article III of the Constitution requires a litigant to possess standing to sue in order for a

---

[3] Defendants also challenge the district court's reliance on two pieces of evidence: the Verified Complaint and Eliezer Appel's deposition. Response Br. at 30–33. But, Defendants failed to raise these objections below and have therefore waived them. *See Bell v. Brockett*, 922 F.3d 502, 513 (4th Cir. 2019) ("Appellants may not raise arguments on appeal that were not first presented below to the district court."). We will treat the Verified Complaint as the equivalent of an affidavit for purposes of summary judgment and will also consider Appel's deposition testimony. *See Goodman*, 986 F.3d at 498 ("a verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge.") (cleaned up).

lawsuit to proceed in federal court." *Ali v. Hogan*, 26 F.4th 587, 595 (4th Cir. 2022). The United States Supreme Court outlined the "irreducible constitutional minimum" requirements for Article III standing: "(1) an injury in fact; (2) a causal connection between the injury and the conduct complained of, such that the injury is fairly traceable to the defendant's actions; and (3) a likelihood that the injury will be redressed by a favorable decision." *Id.* at 595–96 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). For an injury to satisfy Article III's requirements, it "must be concrete, particularized, and not conjectural or hypothetical." *Pye v. United States*, 269 F.3d 459, 467 (4th Cir. 2001).

Defendants argue that FX has failed to satisfy the first element: injury-in-fact. Response Br. at 36–37. Defendants argue that because FX had already transferred title of the Boeing to an affiliate before it requested the logbooks, it lacks standing for any alleged financial losses stemming from being forced to sell the plane without the logbooks. Response Br. at 36; *see* J.A. 347 (FX selling the Boeing to CF Aviation Trust, LLC on June 25, 2018).[4] Pointing to the losses it suffered as a result of Defendants' alleged scheme, FX protests that it has satisfied the injury-in-fact requirement.

We hold that FX has alleged financial harm, which constitutes an injury-in-fact. As this Court has explained, "financial harm is a classic and paradigmatic form of injury in fact." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (citation

---

[4] Defendants also argue that, in repossessing the Embraer, FX violated numerous provisions of the South Carolina Commercial Code. Response Br. at 42–43. The district court made no findings on this matter and, if Defendants wanted to challenge the repossession, they could have brought a counterclaim or suit under South Carolina law. For purposes of the standing inquiry, the Court declines to consider this argument.

omitted).   This includes a reduction in property value, even if the plaintiff does not imminently intend to sell the property in question.  *See Pye*, 269 F.3d at 468 (decreased property values constitutes an injury-in-fact).   Here, FX alleged that because Defendants withheld the Boeing and Embraer's logbooks, the planes were worth significantly less money without the logbooks, such that it suffered a diminution in property value.  J.A. 388 ("without the maintenance records, FX asserts that the Embraer and Boeing were essentially unmarketable."); J.A. 310 (deposition of Kimbrell:  "we were essentially told [by various aviation experts and lawyers] the value of the plane was scrap without the records"); *see also United States v. Sturm*, 870 F.2d 769, 770 (1st Cir. 1989) ("A plan[e] without logbooks ordinarily can be used only for noncommercial purposes, and thus has a lower value.").   Additionally, FX alleged that because Defendants did not use the loans to maintain and convert the planes, it was forced to sell the planes at a significant loss, J.A. 14–16 (describing selling the four planes for a total loss of $2,445,000), which is also a cognizable financial injury.[5]

Reading the record in the light most favorable to FX—the nonmoving party—FX has sufficiently demonstrated all three standing requirements.

---

[5] It is true that there is some uncertainty regarding how and why FX transferred ownership of the two planes.  While this is unaddressed by FX and the district court, the record provides clarification.   In his deposition, Kimbrell describes both transfers as "internal transfers" for the purpose of easing certification with various regulatory bodies.  J.A. 311–15.  The Bills of Sale support this understanding.  J.A. 347 (CF Aviation Trust paying $1 for the Boeing); J.A. 348 (Exodus Aircraft paying $10 for the Embraer).  If remanded, the fact finder may need to make additional inquiry and findings into the nature of these transfers and the relationships between the various entities.  But, for purposes of summary judgment, FX's allegations are sufficient.

14

B.

Next, we turn to whether summary judgment was appropriate on FX's § 1962(c) claim. For the reasons set forth below, we hold that there is no genuine dispute of material fact that Defendants did not engage in a pattern of racketeering activity, and, for this reason, we affirm the district court's grant of summary judgment for the Defendants.

Section 1962(c) states: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through *a pattern of racketeering activity* . . . ." 18 U.S.C. § 1962(c) (emphasis added). "The Supreme Court has explained that a civil RICO claim has four essential elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 F. App'x 257, 258 (4th Cir. 2011) (unpublished) (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).

For purposes of this appeal, we assume (without deciding) that FX has satisfied its burden as to three of the four elements. We assume that there is a genuine dispute of material fact that Defendants together constituted an enterprise. We also assume that there is a genuine dispute of material fact that Defendants committed racketeering activity, namely by engaging in wire fraud and extortion. 18 U.S.C. § 1961(1)(B) (defining racketeering activity). For wire fraud, we assume that there is a genuine dispute of material fact that Defendants engaged in a scheme to defraud FX by withholding the logbooks and submitting invoices for work that was never performed, and that Defendants used wire

15

communications as part of that scheme. *See* 18 U.S.C. § 1343; *see also ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 181 (4th Cir. 2002) (to prove wire fraud, a plaintiff must "show (1) a scheme to defraud and (2) use of a . . . wire communication in furtherance of that scheme."). In addition, we assume that there is a genuine dispute of material fact that Defendants engaged in extortion by withholding the logbooks. *See* 18 U.S.C. § 1951(b)(2); *see also Sturm*, 870 F.2d at 773 (holding that a debtor committed extortion by withholding a plane's logbooks when the lender repossessed the plane). Our discussion here only pertains to the third element—whether Defendants have engaged in a *pattern* of racketeering activity.

"[T]here is no mechanical formula to assess whether the pattern requirement has been satisfied; it is a commonsensical, fact-specific inquiry." *ePlus Tech., Inc.*, 313 F.3d at 182. A "'pattern of racketeering activity' requires at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). And as the Supreme Court has observed, "while two acts are necessary, they may not be sufficient" to establish a "pattern of racketeering activity;" in fact, "two isolated acts of racketeering activity do not constitute a pattern." *Sedima*, 473 U.S. at 496 n.14. Rather, a pattern only exists if there is "*continuity plus relationship*." *Id.* (quoting S. Rep. No. 91–617, p. 158 (1969)) (emphasis in original); *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) ("[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."); *see also US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 318 (4th Cir. 2010). "These

16

requirements are designed to prevent RICO's harsh sanctions, such as treble damages, from being applied to garden-variety fraud schemes." *ePlus Tech.*, 313 F.3d at 181. "We have reserved RICO liability for ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (cleaned up).

Here, the parties agree that the alleged predicate acts are related, but they dispute whether the continuity element is satisfied. The Supreme Court has recognized two types of continuity: closed-ended and open-ended. *US Airline Pilots Ass'n*, 615 F.3d at 318 (discussing *H.J. Inc.*, 492 U.S. at 241–42). As we have explained, "[c]ontinuity refers 'either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.'" *GE Inv. Priv. Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) (quoting *H.J. Inc.*, 492 U.S. at 241). And as we set forth in *Brandenburg v. Siedel*,

> [f]actors relevant to th[e] inquiry [regarding the existence of a RICO pattern] include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries . . . . These factors are not exclusive, and no one of them is necessarily determinative.

859 F.2d 1179, 1185 (4th Cir. 1988), *abrogated on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). FX argues that both closed-ended and open-ended continuity are satisfied here. We disagree, holding that neither are met.

1.

A party can demonstrate closed-ended continuity "by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. It is undisputed that FX has failed to do so.

Here, the Defendants engaged in a years-long scheme, stretching from 2016 to at least 2022 (when FX filed its complaint). This suggests that the continuity element may be met.[6] But, while "the length of time over which [the predicate acts] were committed" is certainly a factor for this court to consider, no factor is "exclusive" nor "necessarily determinative." *Brandenburg*, 859 F.2d at 1185.

Turning to the other *Brandenburg* factors and our subsequent case law, FX's claim falls short. Integral to this analysis is the scope of the scheme, including the intended goal and the number of victims. *See Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (finding no "pattern of racketing activity" when the defendants' actions "were narrowly directed towards a single fraudulent goal"); *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987) (finding no "pattern of racketeering activity" when defendants only engaged in "a single, limited scheme"); *Al-Abood*, 217 F.3d at 238 (acknowledging that "[t]here is no per se rule against a RICO claim involving only one victim," but finding the factor significant in holding that there was no pattern).

---

[6] Because of RICO's statute of limitations, the district court found that FX is time barred from collecting damages stemming from predicate acts occurring before April 19, 2018, *see* J.A. 94, and neither party has challenged this holding on appeal. Nonetheless, for purposes of determining whether there is a "pattern of racketeering activity," the Court will look to time-barred conduct. This is because the pattern analysis goes to the merits of whether a RICO violation occurred, not to the computation of damages.

Here, the scheme was only focused on one goal (obtaining money from FX) and only targeted one victim (FX). While FX argues that Defendants' scheme "actually harmed multiple victims," it fails to identify those other victims. Opening Br. at 23; *see also* Reply Br. at 6. The closest FX gets to identifying another victim is discussing Regional One, the company that considered purchasing the Embraer. Opening Br. at 22. But, at best, FX alleges that the sale fell through, and Defendants held on to Regional One's original deposit. J.A. 10–13. But FX's allegations relating to Regional One are a far cry from Defendants' alleged scheme of entering into fraudulent loans with and extorting money from FX. Indeed, FX's own characterization of the scheme shows that FX was the only victim and the scheme's only goal was to defraud and extort it. *See* Opening Br. at 13 (Defendants "devised a fraudulent scheme to obtain loans from FX" and "attempted to extort money from FX by concealing the essential logbooks and maintenance records for the aircraft").

Additionally, the type of alleged predicate acts at issue cuts against a finding of a RICO pattern. Wire fraud constitutes most of the scheme's alleged predicate acts, and the extortion took place via email and text message. Because in the modern era almost all frauds include some form of mail or wire fraud, this Court is "cautious about basing a RICO claim on predicate acts of mail and wire fraud." *Al-Abood*, 217 F.3d at 238 (4th Cir. 2000); *see also GE Inv.*, 247 F.3d at 549. This is particularly so when wire fraud is only conducted in one way, rather than in an "extensive or varied manner." *Whitney, Bradley & Brown*, 436 F. App'x at 263 (contrasting a case where the defendant only used mail and wire transfers in one way to one where the defendants' acts "encompassed a variety of

techniques to deplete corporate assets") (cleaned up). That is the case here. Defendants only used wire fraud to communicate directly with FX and its officers. The use of wire communications here does not raise this case beyond routine fraud, further reinforcing FX's failure to demonstrate that Defendants engaged in a pattern of racketeering. *See e.g.*, *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (declining to apply RICO when "the scheme in the present case does not rise above the routine").

Just as in *Al-Abood*, "the narrow focus of the scheme . . . combined with the commonplace predicate acts" precludes a finding of closed-ended continuity, and therefore of a RICO pattern on this basis. 217 F.3d at 238–39.

2.

FX also alleges that Defendants' scheme constitutes "open-ended continuity." "To allege open-ended continuity, a plaintiff must plead facts that demonstrate a 'threat of continuity,' i.e., facts that give rise to a reasonable expectation that the racketeering activity will 'extend[ ] indefinitely into the future.'" *US Airline Pilots Ass'n*, 615 F.3d at 318 (quoting *H.J.*, 492 U.S. at 242). Again, it is undisputed that FX has failed to meet its burden.

Even if the racketeering activity extends over a significant period of time, "[a] plaintiff cannot demonstrate open-ended continuity if the racketeering activity has a 'built-in ending point, and the case does not present the necessary threat of long-term, continued criminal activity.'" *US Airline Pilots Ass'n*, 615 F.3d at 318–19 (4th Cir. 2010) (quoting *GE Inv.*, 247 F.3d at 549). "[T]he threat of continuity may be established by showing that

the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J.*, 492 U.S. at 242.

In *GE Investment*, this Court found that open-ended continuity was not satisfied in a general scheme to defraud investors. 247 F.3d at 549. As we explained, "Defendants' conduct was all designed for the single goal of allowing Defendants to profit from their interests in [a single corporation]" and "the very nature of the lender fraud was such that Defendants could not continue the fraud beyond a limited period of time." *Id.* at 549–50. The same is true here. Allegedly, Defendants had one goal: to defraud FX. And, like with other schemes to defraud investors, such as in *GE Investment*, there is no reasonable expectation that the scheme will proceed indefinitely. FX, the sole victim, has identified the scheme and may now take steps to protect itself, including through the prosecution of state tort law remedies.

* * *

To be clear, FX's allegations are serious. However, "this circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp.*, 841 F.2d at 538. This case simply does not present the type of "ongoing unlawful activity whose scope and persistence pose a special threat to social well-being" warranting RICO intervention. *Anderson v. Found. for Advancement, Educ. & Emp. of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998) (citation omitted).

Since there is no genuine dispute of material fact that Defendants did not engage in a pattern of racketeering activity, FX's § 1962(c) claim must fail. And, because Defendants have not satisfied the pattern element, it is not necessary for us to consider whether FX is

21

a proper party to bring suit and whether Defendants committed a RICO predicate offense. We therefore affirm the district court's grant of summary judgment to the Defendants.

C.

We also hold that the district court properly granted summary judgment for the Defendants on FX's RICO conspiracy claim.

RICO's conspiracy provision states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section." 18 U.S.C. § 1962(d). RICO's conspiracy is more comprehensive than the general federal conspiracy provision and does not require that each defendant perform "some overt act or specific act" in furtherance of the conspiracy. *Salinas v. United States*, 522 U.S. 52, 63 (1997). In this way, "a plaintiff could . . . sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962." *Beck v. Prupis*, 529 U.S. 494, 506–07 (2000). To satisfy a RICO conspiracy, "a conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas*, 522 U.S. at 53.[7]

Here, as explained above, Defendants have not engaged in a pattern of racketeering activity that would satisfy the substantive RICO claim under § 1962(c). Moreover, FX has presented no evidence that Defendants intended for any scheme to extend any further than

---

[7] While *Salinas* concerned criminal RICO, the same elements apply in the civil context. *See Baisch v. Gallina*, 346 F.3d 366, 376–77 (2d Cir. 2003) (applying *Salinas* in the civil context); *Smith v. Berg*, 247 F.3d 532, 538–39 (3d Cir. 2001) (same); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc*., 831 F.3d 815, 822–23 (7th Cir. 2016) (same); *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012) (same).

it did so as to, if completed, satisfy all the elements of a substantive RICO offense. *See Salinas*, 522 U.S. at 65. We therefore affirm the district court's grant of summary judgment to the Defendants.

V.

Turning to the two motions pending before us, we deny Appellees' Request for Judicial Notice (Dkt. 34) and grant Appellant's Consent Motion to Supplement Record on Appeal (Dkt. 58).

As for the first motion, Appellees-Defendants request that this Court take judicial notice of six documents, largely filings or transcriptions from separate but apparently related proceedings. Defendants motion is devoid of any reasoning explaining why the documents are relevant or what facts they contain that are "not subject to reasonable dispute." Fed. R. Evid. 201(b). Indeed, several of the documents are briefs filed by the Defendants in other cases. And, as all these briefs were filed and the proceedings transcribed occurred prior to the Notice of Appeal in this case, it is not clear why these were not included in the record below and in the Joint Appendix. We deny this motion.

As for the second motion, the parties jointly seek to supplement the record with the district court's December 7, 2023, order stating that any question relating to Guerrero's service or need to file an answer was moot in light of the district court's grant of summary judgment. As this is part of the district court's record below and relates to the question of this Court's jurisdiction, the motion is granted.

VI.

We hold that FX has Article III standing to bring it claims. But FX failed to demonstrate a genuine dispute of material fact that Defendants engaged in a pattern of racketeering activity, dooming its § 1962(c) claim. And, because FX has failed to allege that Defendants conspired to engage in a pattern of racketeering activity, FX's § 1962(d) claims fail as well. For the foregoing reasons, we affirm the district court's grant of summary judgment to Defendants on both counts. We deny Appellees' Request for Judicial Notice (Dkt. 34) and grant Appellant's Consent Motion to Supplement Record on Appeal (Dkt. 58).

*AFFIRMED*